# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 24-3453

———————————————

United States of America

*Plaintiff - Appellee*

v.

Tashena Lavera Crump

*Defendant - Appellant*

———————————

Appeal from United States District Court
for the District of Minnesota

———————————

Submitted: December 19, 2025
Filed: June 30, 2026

———————————

Before LOKEN, LAVENSKI R. SMITH, and KOBES, Circuit Judges.

———————————

LAVENSKI R. SMITH, Circuit Judge.

A jury convicted Tashena Lavera Crump of wire fraud and conspiracy to commit mail fraud for participating in a scheme to fraudulently sell magazine subscriptions. Crump appeals, arguing that (1) there is insufficient evidence to

support her convictions; (2) the district court[1] abused its discretion in instructing the jury on the elements of wire fraud; and (3) the district court erred in denying her motion for dismissal or a new trial based on alleged discovery violations. We affirm.

## I. *Background*[2]

The present case concerns "a nationwide conspiracy to defraud individuals by representing that the coconspirators would renew or reduce the cost of existing magazine subscriptions and instead sign victims up for new subscriptions." R. Doc. 2307, at 2. Telemarketing company owner Rusty Rahm came up with the idea of fraudulently selling the "renewals," R. Doc. 2026, at 136, known as "paid during service" (PDS) sales, *id.* at 135. The scheme involved two interrelated enterprises. Lead list brokers would acquire and sell contact lists of potential targets of the scheme. Telemarking call centers would then contact the targets and entice subscription holders to purchase new magazine subscriptions through prewritten deceptive dialog. *See* R. Doc. 2307, at 2.

Brian Williams owned Readers Club Home Office (RCHO), also known as Pacific Renewal Service, a Minnesota-based telemarketing company. Between approximately 2007 and 2020, RCHO was using a "price reduction" sales pitch to sell magazines. R. Doc. 2034, at 212. Williams used a short script in which he represented that he was "calling to check upon the service of your magazines" and was not selling anything "new." R. Doc. 2029, at 48. This pitch was a "lie." *Id.* A written script recovered from the RCHO office read:

> Hello *(Customer Name)*? Hi, my name is *(your name)* with Pacific Renewal Service, the folks that send out Magazines, how are you today? *Wait for customer to respond!* We were just calling to check up

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[2]"We recite the facts in the light most favorable to the verdict." *United States v. Kirkendoll*, 61 F.4th 1013, 1015 (8th Cir. 2023).

on the magazines, was everything arriving on time and in good condition for you? *Wait for customer to respond!* Great, we wanted to help you by keeping you at OUR lowest price today, just the $14.95 a month, that sounds better on the budget, right? *Wait for customer to respond!* I'm a little bit new here so I am just going to update some information with you and have my supervisor hop on the line, just to make sure I did my job correctly.

**I have your address as *(verify entire address, including city, State and zip code)*, is that correct? *Wait for customer to respond! **If address is incorrect, get new address.*

**Can I verify your age, how young are you? (18–75)

**Are you married, or single?

**What type of work are you doing out there, what's a job title for you? (*IF MARRIED, BUT NOT GETTING INCOME, ASK WHAT KIND OF WORK THEIR SPOUSE DOES, MUST GET A JOB TITLE*)

**Do you rent or own where you live?

**Lastly, which major debit or credit card do you use the most? VISA, MASTERCARD, AMERICAN EXPRESS, DISCOVER? *(Must have a credit card to transfer)*

Great! I am going to have my supervisor hop on the line to make sure I have done everything correctly for you. If you could slip in a good word for me, let him/her know I was nice and polite with you? Thank you, hold one moment please!

Gov't Ex. E35, at 2 (emphases in original).

RCHO also had written rebuttals following its script. For example, if the customer asked "[w]hat am I paying now," the telemarketer was to respond:

It just shows me here you are making a full price payment, I am very new and they don't give me access to that information. The purpose of

my phone call is to keep you at our lowest price just $14.95 a month until everything does end, that sounds better on the budget, right?

*Id.* at 4 (underline omitted).

In 2010, Williams hired Crump as an RCHO telemarketer. Crump was not provided with a written script from which to read; instead, she learned the sales pitch from listening to other telemarketers. After working as a telemarketer for a few months, Crump moved to collections. During her time as a telemarketer or collector, Crump was associated with 173 transactions for RCHO.

In 2011, Crump was promoted to general manager. Crump "essentially ran the office" and "handled all the day-to-day operations." R. Doc. 2034, at 212. This included "pay[ing] bills, oversee[ing] the sales room, collections, PS Online [a customer relation management system[3]], [and] all the things that went along with running a magazine company." *Id.* at 213. By 2016, a severe drug addiction kept Williams from the office "for weeks at a time[]." R. Doc. 2040, at 211.

As general manager, Crump handled leads for RCHO, including buying, trading, and selling telemarketing lead lists. Daniel Klibanoff was a lead list broker who had a "home office in Asheville, North Carolina." R. Doc. 2031, at 123. Lead list brokers "would buy and sell lists of vulnerable individuals with existing magazine subscriptions, and telemarking call centers . . . would execute the fraud." R. Doc. 2307, at 2. Klibanoff described Crump as Williams's "right hand" who was "very much a part of making sure that everything came together so the fraud could be perpetrated, having the leads on the right days." R. Doc. 2031, at 39. Crump would complain to Klibanoff "[i]f there were problems with the leads." *Id.* On several occasions, Crump emailed Klibanoff with inquiries and complaints about lead lists.

---

[3]*Id.* at 186.

The record contains email conversations dating from May 2016 through October 2019 between Crump and Klibanoff and Crump and John Harbert, a lead list broker from New Mexico. These conversations, admitted into evidence through government exhibits, established that Crump knew of the falsity of the representations in the telemarketing scripts and purposely participated in the targeting of vulnerable persons for calls through the exchange of lead lists. *See, e.g.*, Gov't Ex. F46; Gov't Ex. F65; Gov't Ex. F71; Gov't Ex. F78; Gov't Ex. F101; Gov't Ex. F115; Gov't Ex. F127; Gov't Ex. F131; Gov't Ex. F133; Gov't Ex. F136; Gov't Ex. 140; Gov't Ex. F142; *see also* R. Doc. 2031, at 47, 49; R. Doc. 2033, at 111.

Crump also coordinated the sharing of PDS lead lists between RCHO and two other companies that Williams had agreed to share leads with. According to Jared Michelizzi, the owner of telemarketing companies based out of Minnesota and California, he traded lead lists with Crump "several times a month" or "at least" "[a] couple times a month." R. Doc. 2034, at 216. These lead lists "came from the lead brokers," such as Klibanoff. *Id.* Michelizzi sent "Klibanoff leads" to Crump. *Id.* When Michelizzi received leads from Crump, he would "call that same lead list." *Id.* He did so with the understanding that either "RCHO had already called that lead list" or they "would be calling it at the same time." *Id.* According to Michelizzi, "Crump knew that [they] were both calling the same people." *Id.* at 216–17. Michelizzi based his knowledge on the operation's standard procedures with lead lists. Michelizzi also frequently discussed with Crump "how various lead lists were performing." *Id.*

Additionally, emails dating from July 2011 through January 2015 show that Crump coordinated the sharing of PDS lead lists with Wayne Dahl's Minnesota-based telemarketing company. These conversations, also admitted through government exhibits, show Crump referring to PDS lead lists as, for example, "fire" and "good stuff." *See, e.g.*, Gov't Ex. F1; Gov't Ex. 49; Gov't Ex. F2; Gov't Ex. F3; Gov't Ex. F8; Gov't Ex. F9; Gov't Ex. F10; Gov't Ex. F44; *see also* R. Doc. 2033, at 116.

James Sierra, the manager of a telemarketing company in Arizona, also provided lead lists to Crump after she contacted him. The only type of lead list that Sierra had "were PDS leads." R. Doc. 2032, at 213.

Crump knew that RCHO was suspected of fraudulent activity. While Crump was RCHO's general manager, agencies from two states investigated RCHO for fraudulent practices. In 2014, Wisconsin filed a complaint alleging that "[a]s part of their telemarketing, RCHO used a deceptive and misleading sales script. The RCHO script led Wisconsin residents to believe that a magazine company they currently had an agreement with was the entity who was calling them concerning their magazine subscriptions." R. Doc. 2040, at 94. Crump was aware of and admittedly read "some of" the complaint. *Id.* at 263. RCHO entered a consent judgment with Wisconsin. Crump was aware of the consent judgment. She signed it "as a notary." *Id.* at 262.

In 2015, Minnesota launched its investigation into RCHO's fraudulent practices. Crump met with Williams and Michelizzi "about the [Minnesota] Attorney General investigation" "three days" after it became public. R. Doc. 2034, at 192. Crump, Williams, and Michelizzi agreed to modify the script to send to the Minnesota Attorney General because the one they had been using was not "compliant." *Id.* at 218. Ultimately, the script that RCHO provided to Minnesota contained a "legal disclaimer"; however, RCHO had not used the modified script. *See* R. Doc. 2040, at 268–69.

RCHO also received numerous consumer complaints. Some of these complaints came from state consumer protection agencies or the Better Business Bureau (BBB). Several complaints were found in Crump's office or were sent to her email. One of the complaints found in Crump's office described the very fraud that Crump was charged with perpetrating. It read, "This company tricked me into subscribing to their magazine service. When I tried to cancel, they wouldn't let me. Then they deceived me by telling me they would lower my monthly payment." R. Doc. 2039, at 171. The complaint continued, stating, "What they actually did was

open another account and are now charging me for that too." *Id.* Another complaint read, "I was contacted by Pacific Renewal Services over a year ago, posing as representatives of the magazines that I currently had subscriptions with, but which were ending soon." *Id.* In addition to the complaints found in Crump's office, "documents related to charge-back rebuttals" were located "in Ms. Crump's desk." R. Doc. 2038, at 197. A chargeback is when a customer disputes a charge with his or her credit card company or banking institution. The merchant is then "made aware that . . . the money was going to go back to the customer, as opposed to the company getting the money." *Id.*

Williams "develop[ed] . . . a complaint sharing system between [Michelizzi], Williams,] and Wayne Dahl, because at some point [they] were all getting similar leads." R. Doc. 2034, at 219. At Williams's direction, Crump would notify Michelizzi of a consumer complaint; Michelizzi reciprocated. "[M]ore than half the time" Michelizzi would have "the same person in [his] database . . . who Ms. Crump shared had complained." *Id.* at 220. "[T]he purpose of this complaint sharing system" was to "get rid of problem people." *Id.*

Williams also hired compliance companies "to create the appearance of legitimacy." R. Doc. 2029, at 165. When Dahl asked Williams why he did so, Williams replied, "[I]f they . . . look at my company or I ever get into a pinch, I can say that I've done all this, and I'm doing everything a legitimate way." *Id.* In 2011, RCHO hired CompliancePoint to assess its compliance with telemarketing laws. Crump was CompliancePoint's "primary point of contact." R. Doc. 2040, at 31. CompliancePoint conducted an onsite visit of RCHO in December 2011. Before this visit, CompliancePoint sent RCHO "a list of departments that [it] . . . need[ed] to interview." *Id.* at 75. In particular, CompliancePoint wanted to speak with business unit managers, legal personnel, training personnel, and personnel involved in call center operations. But when CompliancePoint consultants arrived at RCHO, "the office was empty." *Id.* at 77. Only Crump was in the office for the on-site visit. Because the telemarketers were not present, the consultants never heard a telemarketer on the phone or witnessed their sales pitch.

Crump provided CompliancePoint with scripts for it to review. These scripts were "[n]oncompliant." *Id.* at 50. Crump sought advice from CompliancePoint on how to improve the scripts. When CompliancePoint sent back the scripts, it did not alter RCHO's sales pitch because sales language was outside the traditional scope of its work. But CompliancePoint advised RCHO in writing that "[f]ederal law . . . requires a prompt statement of the purpose of the call, the nature of the goods or services offered and a statement that no purchase is necessary to win a prize or gift (only if a prize or gift is offered)." *Id.* at 88. Further, it advised RCHO that "[f]ederal and state law also bar deception and misrepresentation in all scripts." *Id.* at 89. Thus, CompliancePoint advised "Crump that [RCHO] telemarketers cannot engage in deception." *Id.* Despite this advice, RCHO sales scripts were never modified to include a prompt statement of the purpose of the call or request the customer's explicit approval to sign up for a new magazine subscription.

RCHO retained CompliancePoint for assistance with state telemarketing registration and other services until 2019. From 2011 to 2019, CompliancePoint obtained information about RCHO from Crump. Crump never disclosed to CompliancePoint that RCHO "telemarketers [were] calling new customers without disclosing that they were, in fact, a new magazine company," that RCHO telemarketers were calling "customers with existing magazine subscriptions with a different company, and representing themselves as calling from the customer's current magazine provider," or that RCHO was "billing customers for new magazine subscriptions without getting those customers' explicit approval to do so." *Id.* at 79. Nor did Crump speak with CompliancePoint about any of the customer complaints that RCHO had received, including complaints from the BBB or state attorneys general.

On February 19, 2020, federal law enforcement executed a search warrant at RCHO. "The warrant authorized the government to seize evidence related to the telemarketing fraud scheme, including emails, computers, and other digital devices." R. Doc. 1846, at 2. Law enforcement seized various electronic devices from RCHO. "Although the search warrant authorized the government to seize emails related to

the telemarketing fraud scheme, the government did not find bulk emails on the computers it seized during the search of RCHO." *Id.* This was because RCHO used Google, a third-party service provider, to store its emails remotely. The government never obtained a separate search warrant for Crump's Google email account so that it could seize data from the internet.[4] Nonetheless, it obtained more than a thousand of Crump's emails from searching other coconspirators' email accounts.

In October 2020, Crump, along with 43 others, was charged with conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1349 and 2326. She was also charged with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2326. In early 2021, the government provided a "'second round of rolling discovery' and noted in a summary spreadsheet that it had the devices from Crump's workplaces." R. Doc. 2425, at 2. In a follow-up letter to defense counsel, the government explained that "[d]ue to the large number of devices, the government [did] not cop[y] all of the devices." *Id.* (citing Gov't Decl., Ex. 3 at 2). But it advised that "[t]h[e]se electronic devices are available for inspection or copying upon request. Please let us know if you would like to inspect or receive copies of any of these electronic devices." *Id.* at 2–3 (quoting Gov't. Decl., Ex. 3 at 2).

"Two years later, in July 2023, Crump took the government up on its offer and requested access to all digital evidence seized from RCHO." *Id.* at 3. In response, "[t]he government provided Crump with two discs that it said 'contain the forensic images of the electronic devices seized from the RCHO office.'" *Id.* (quoting March Fisher Decl., Ex. E). In actuality, "the discs produced in July 2023 did not contain 'the forensic images of the electronic devices, but rather the logical copies of the network drives of those devices that were on the discs.'" *Id.* at 4 (quoting R. Doc. 2378, at 5). As a result, "only contents stored on shared network drives were

_____

[4]According to the government, it did not seek a search warrant for her email account because warrants for Google accounts using a domain name other than "gmail.com—such as Crump's email of shena@readersclubinc.com—[are] often met with a response from Google to go to the organization—in this case RCHO— for the contents of the account." R. Doc. 1846, at 3 n.1.

produced, while any content saved locally to the 21 devices was not." *Id.* This meant that "of the more than 55,000 documents since recovered from the 21 devices, only around 3,000 were included in the July 2023 production." *Id.*

On September 12, 2023, a few weeks prior to trial, Crump requested "to 'examine the computers seized during the search and for which [she] received forensic images'" based on her "concern[] that not all information from the computers ha[d] been made available to [her]." *Id.* at 3 (quoting March Fisher Decl., Ex. F at 3). Crump asked to "see how files were arranged on the computers but did not 'want to otherwise access, open, or examine the files'" based on her "understanding that the contents of all files from the forensic examination of the computers ha[d] already been provided to [her]." *Id.* In response, the government stated that "once the computers are turned on and accessed, it's no longer a forensic review because it no longer maintains the original form and function as the time the device was seized." *Id.* (quoting March Fisher Decl, Ex. G at 2). The government noted that it could "pass along any 'specific question[s]' to the FBI forensic team." *Id.* at 4 (alteration in original) (quoting March Fisher Decl., Ex. G at 2). Thereafter, "Crump ceased her efforts to obtain access to the computers." *Id.*

The contents of Crump's emails and access to them became a major point of contention prior to trial and into the trial. Crump learned that Google had deleted her RCHO email account in August 2022. On September 18, 2023, Crump filed a "Motion for Relief from Failure to Search and Preserve Emails." R. Doc. 1811. Crump alleged that "[t]he [g]overnment's failure to search and preserve the emails violated *Brady*[5] and its progeny." *Id.* at 8. She also argued that the government's failure to preserve and disclose her emails "violate[d] [the district] [c]ourt's orders and Federal Rule of Criminal Procedure 16." *Id.* at 10. She suggested that "the most appropriate sanction" for the *Brady* violation was "dismissal" of the indictment. *Id.* at 14. In response, the government argued that it never possessed Crump's emails, was prohibited from searching Crump's RCHO emails by accessing her open Google

---

[5]*Brady v. Maryland*, 373 U.S. 83 (1963).

account without a separate search warrant authorizing such search, and had no obligation to seek a separate warrant to obtain Crump's emails. The government also disputed Crump's claim that her RCHO emails were exculpatory.

Following a pretrial hearing, the court denied the motion. It concluded that "[t]he government had no obligation to execute search warrants on Crump's behalf; its sole obligation was to turn over exculpatory evidence in its possession." R. Doc. 1970, at 3. The court concluded that Crump failed to credibly allege that "the government violated that duty, []or . . . destroyed any evidence." *Id.*

Trial commenced on October 9, 2023. During trial, the district court granted Crump leave to file a renewed motion based on evidence adduced at trial on October 20, 2023. In the renewed motion, Crump alleged that the evidence showed that the government did have possession of her emails and had possibly reviewed them. The same day that Crump filed her renewed motion, the government discovered that discs provided to Crump in July 2023 failed to include complete copies of the RCHO devices, as the government had previously represented. The government immediately notified Crump and provided her with forensic images of the devices. Crump thereafter raised this additional discovery issue with the district court.

The district court denied Crump's renewed motion. First, as to Crump's emails, the court determined that the government did not possess Crump's emails "simply because it [was] in sight while law enforcement execute[d] [the] search warrant." *Id.* at 5. Because the government did not possess Crump's emails, the court concluded that the government did not violate *Brady* when it failed to preserve and produce them. Additionally, the court found that Crump "provided scant evidence beyond allegations that the emails contained exculpatory content." *Id.* at 7. "Though now unavailable," the court explained, "Crump had two years to log in to her email account and download content, or, if that was not an option, to subpoena the content from Google." *Id.*

Second, as to the discovery violation, the court found that the government's Rule 16 violation did not result in prejudice that warranted dismissal of the charges. Instead, the court determined that the "appropriate remedy [was] to forbid the government from introducing or otherwise using any of the undisclosed materials without prior permission from the [c]ourt." *Id.* at 8. Importantly, the court indicated that "Crump should have time to review the files before presenting her defense, *if she chooses to do so*." *Id.* (emphasis added). Crump, however, chose not to request additional time to review the files.

After the government rested its case on October 31, 2026, Crump moved for judgment of acquittal. She did not dispute the existence of a fraud conspiracy; instead, she argued that the government produced insufficient evidence of her "knowledge of a voluntary agreement to join a conspiracy and . . . intent to defraud." R. Doc. 2040, at 9. The district court denied the motion.

Crump testified in her own defense. She admitted that a fraud conspiracy existed but denied knowing about the fraud. She testified that she was "[f]ooled by Brian [Williams]." *Id.* at 203.

After the close of all evidence, the court held a charge conference to discuss the proposed jury instructions. Prior to trial, Crump had submitted proposed jury instructions on wire and mail fraud that differed from the court's proposed instructions. Crump's proposed instructions provided, in relevant part, that "a material false statement is not alone sufficient to convict a defendant [of] wire [or mail] fraud. There must also be an unlawful deprivation of property." R. Doc. 1776, at 34; *see also id.* at 39. The district court rejected Crump's proposed instruction. The jury found Crump guilty on all counts.

Post-trial, Crump "continue[d] to investigate devices seized from RCHO, the contents of which were not fully produced by the government." R. Doc. 2307, at 19. In addition, she moved for judgment of acquittal or new trial. In her motion, Crump repeated her earlier argument that while there was a nationwide conspiracy, she was

not privy to it and did not join it. The district court concluded that sufficient evidence existed that Crump "conspired with Brian Williams to run RCHO. And she conspired with others outside RCHO to buy and sell lead lists and further the fraudulent scheme, including at minimum, testifying codefendants Wayne Dahl, Daniel Klibanoff, James Sierra, and Jared Michelizzi." *Id.* at 6.

Crump next argued that insufficient evidence existed that she committed mail and wire fraud because "the scripts used by RCHO were literally true." *Id.* at 10. The court disagreed, concluding that "[a]ny reasonable person would assume that a telemarketer calling to check up on 'the magazines' and 'keep[]' the recipient at a low price was the recipient's current magazine provider." *Id.* (alterations in original). The court found that "Crump's actions at RCHO were 'reasonably calculated' to trick victims into thinking they were talking to their current magazine providers and not signing up for new subscriptions." *Id.* Crump additionally argued that "her engagement of CompliancePoint [was] inconsistent with an intent to defraud." *Id.* at 11. The court rejected this argument, noting that Crump had "repeated that point ad nauseam to the jury, and the jury rejected that inference." *Id.* The court cited testimony "that compliance firms were used as a would-be get out of jail free card, to give their operations a veneer of legitimacy. The intent was to provide cover, not to ensure she was not perpetrating fraud." *Id.* The court also cited testimony "that Crump withheld numerous pieces of information [from CompliancePoint] that would have been 'red flags' had she properly disclosed them." *Id.*

Finally, the court rejected Crump's argument that RCHO sending its victims magazines necessitated a different instruction for mail and wire fraud. The court explained, "It would create an untenable loophole in the federal fraud statutes to allow individuals to make material misrepresentations attempting to deprive others of their money simply because a defendant provides some nominal good or service in return." *Id.* at 17.

The court denied Crump's motion for judgment of acquittal and parts of her motion for a new trial. But because of the "ongoing investigation . . . on potential

discovery and *Brady* issues," the district court "reserve[d] judgment" on the portion of Crump's motion for new trial or dismissal concerning potential discovery and *Brady* violations. *Id.* at 19. It afforded her time "to file a supplemental brief when her review of the devices [was] complete." *Id.*

In June 2024, Crump filed briefing and a supporting declaration identifying allegedly exculpatory evidence from the RCHO devices. Thereafter, the district court denied the remaining portion of Crump's motion for a new trial or dismissal. The court determined that the government "inadvertently suppressed favorable evidence" but that "Crump was not prejudiced by the incomplete production of the RCHO devices." R. Doc. 2425, at 6.

## II. *Discussion*

On appeal, Crump argues that (1) there is insufficient evidence to support her convictions; (2) the district court abused its discretion in instructing the jury on the elements of wire fraud; and (3) the district court erred in denying her motion for dismissal or a new trial based on alleged discovery violations.

### A. *Sufficiency of the Evidence*

First, Crump challenges the district court's denial of her motion for judgment of acquittal. She argues that insufficient evidence supports her fraud and conspiracy convictions because RCHO "did not misrepresent its identity and the products it was selling to potential customers" or "actively conceal this information." Appellant's Br. 28. She also asserts that insufficient evidence exists that she "knowingly agreed to the conspiracy alleged in the [i]ndictment, given the substantial variations between the practices at her employer and those of other companies run by people totally unlike her, namely serial fraudsters and criminals." *Id.*

We apply de novo review to the district court's denial of Crump's motion for judgment of acquittal. *United States v. Earth*, 984 F.3d 1289, 1300 (8th Cir. 2021). "We apply the same standard of review to the district court's ruling on a motion for judgment of acquittal as we do to a sufficiency of the evidence challenge." *Id.*

(quoting *United States v. Clark*, 668 F.3d 568, 573 (8th Cir. 2012)). We view the evidence "in the light most favorable to the verdict" in "consider[ing] whether a rational jury could have found the elements of the offense beyond a reasonable doubt." *Id.* (quoting *United States v. Owens*, 966 F.3d 700, 708 (8th Cir. 2020)). Reversal is warranted "only if no reasonable jury could have found the accused guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Two Eagle*, 318 F.3d 785, 790 (8th Cir. 2003)).

The jury convicted Crump of conspiracy to commit mail fraud and three counts of wire fraud. The elements of mail fraud and wire fraud "are virtually identical." *United States v. Louper-Morris*, 672 F.3d 539, 555 (8th Cir. 2012). The elements of mail fraud are as follows: "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) that the mail was used in furtherance of some essential step in the scheme." *Id.* (citation modified). To establish that Crump conspired to commit mail fraud, the government had to prove that "1) there was a conspiracy, an agreement to commit [mail] fraud; 2) [Crump] knew of the agreement; and 3) [she] intentionally joined in the conspiracy." *Id.* For Crump to be guilty of wire fraud, the government had to prove that "1) [Crump] joined a scheme to defraud; 2) [she] intended to defraud; 3) it was reasonably foreseeable that interstate wire communications would be used; and 4) the wires were, in fact, used." *Id.* at 556.

1. *Scheme to Defraud*

Crump first argues that there is insufficient evidence to sustain the wire fraud counts because the government failed to prove a scheme to defraud. Specifically, she asserts that there was no express misrepresentation or active concealment of a relevant fact.

Although the phrase "scheme to defraud . . . may seem slightly amorphous," "cases from this circuit and the Supreme Court have offered more concrete guidance on what the mail and wire fraud statutes require." *United States v. Hansmeier*, 988

-15-

F.3d 428, 436 (8th Cir. 2021) (citation modified). The government must establish the following to prove the existence of a fraudulent scheme: "(1) there was a deliberate plan of action or course of conduct to hide or misrepresent information; (2) the hidden or misrepresented information was material; and (3) the purpose was to get someone else to act on it." *Id.* (quoting *United States v. Luna*, 968 F.3d 922, 926 (8th Cir. 2020)). Criminal liability attaches only if the "scheme to defraud . . . consist[s] of *material* misrepresentations: misrepresentations that have a natural tendency to influence, or are capable of influencing, the decision of the decisionmaking body to which they are addressed." *Id.* (citation modified).

"To defraud someone requires material, affirmative misrepresentations or active concealment of material information for the purpose of inducing action." *Id.* (quoting *Luna*, 968 F.3d at 926). There is no requirement that the scheme to defraud "involve affirmative lies." *Id.* But "simple nondisclosure" is insufficient to "constitute[] a basis for fraud." *United States v. Steffen*, 687 F.3d 1104, 1114 (8th Cir. 2012) (citation modified). A distinction exists "between 'passive concealment— mere nondisclosure or silence—and active concealment, which involves the requisite intent to mislead by creating a false impression or representation." *Id.* at 1115 (quoting *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000)). Active concealment "is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." *Id.* at 1114 (quoting *Colton*, 231 F.3d at 899). By contrast, nondisclosure "is characterized by mere silence. Although silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does." *Id.* (quoting *Colton*, 231 F.3d at 899).

Crump argues that the RCHO scripts do not contain affirmative misrepresentations because they do not say that the caller is from "*your* [the customer's] magazine company" or that the offer is for the customer "to 'renew' a subscription or 'reduce' an existing price." Appellant's Br. 32 (bold omitted). Crump maintains that RCHO's "script correctly identifies the company making the call,

-16-

offers a magazine service at *that* company's lowest price, and then confirms that the magazine subscription is separate from any other subscription that the caller may have." *Id.* at 32–33. Additionally, Crump argues that the government presented no evidence that RCHO actively concealed that it was not the customers' existing magazine company and thus did not conceal material information. She maintains that RCHO's "scripts contain statements which are literally true." *Id.* at 33 (citation modified).

Having reviewed the record, we conclude that the government presented sufficient evidence of a scheme to defraud to sustain the wire fraud counts. For purposes of our analysis, we will assume without deciding that the RCHO telemarketers followed the written script without deviation. Although Crump is correct that RCHO's script does not reference "*your* magazine company," Appellant's Br. 32 (bold omitted), the script does identify RCHO as "the folks that send out Magazines" and states that the call's purpose is to "check up on the magazines" to ensure that everything was "arriving on time and in good condition" and to "help" the customer by "keeping you at OUR lowest price." Gov't Ex. E35, at 2. The script does not purport to sell anything new to the customer. The jury could reasonably infer that these statements were "calculated to deceive the [the customer] into believing that RCHO was not some random company that sent out magazines, but the company that sent out [*the customer's*] magazines." Appellee's Br. 46. In fact, when asked whether the statement "'keeping you at our lowest price today' . . . implies that you're calling from their magazine company," Crump responded, "Well, the 'keeping' I do agree. I don't like that it said 'keeping,' no." R. Doc. 2040, at 214. When asked whether the statement is misleading, Crump replied, "Yes, I guess." *Id.* at 215. She later agreed that RCHO's scripts were misleading. *Id.* at 215–16 ("Q. And we all agree now that the scripts are misleading, correct? . . . . [T]hey are misleading. Yes? A. I don't—okay. Sure. Q. Well, I'm asking you. A. I think— yes.").

In addition, the jury could reasonably conclude that the written rebuttals accompanying RCHO's script were "designed to mislead the [customer] into

believing [the customer] ha[d] an existing account with RCHO." Appellee's Br. 47. For example, if the customer asked what price he or she was currently paying, "the RCHO telemarketer did not truthfully disclose [he or she] had no relationship with the [customer]. Rather, the telemarketer continued to deceive the [customer] by claiming . . . that he is new and RCHO does not give [him] access to that information." *Id.* (citing Gov't Ex. E35, at 4).

In summary, we hold that the jury could reasonably conclude that RCHO's script was not merely silent as to RCHO's true identity but instead affirmatively misrepresented and actively concealed the fact that RCHO was not the customer's existing provider. RCHO's script was designed to "misle[a]d its customers into believing they were receiving a discount on their current magazines but then billed them for a whole new subscription." *Id.* at 48.[6] As a result, the government carried its burden of proving a scheme to defraud.

---

[6]Crump initially argued that even if RCHO materially misrepresented itself as the customer's existing magazine provider, we must still reverse her fraud conviction because it was premised on an improper fraudulent inducement theory. *See* Appellant's Br. 36–38. She subsequently conceded that her argument is foreclosed by *Kousisis v. United States*, 605 U.S. 114, 122–23 (2025) ("The fraudulent-inducement theory is consistent with both the text of the wire fraud statute and our precedent interpreting it. We therefore reject petitioners' proposed economic-loss requirement."). *See* Appellant's Reply Br. 7.

Crump also argues that her conviction should be vacated because she was deprived of fair notice that her conduct was prohibited. She maintains that the wire fraud statute vastly expands federal jurisdiction into an area traditionally reserved to the states. Appellant's Br. 39–41. According to Crump, RCHO's "customers may have state law claims relating to breach of contract and consumer fraud, but to sustain [her] conviction . . . would vastly expand federal criminal liability in a way in which criminal defendants . . . lack fair and definite notice." *Id.* at 41. "We are not persuaded. The 'demanding' materiality requirement substantially narrows the universe of actionable misrepresentations." *Kousisis*, 605 U.S. at 135 (citing *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016)); *see also United States v. Pacilio*, 85 F.4th 450, 460 (7th Cir. 2023) ("The defendants had fair notice that their conduct was prohibited by the wire and

## 2. *Knowledge of the Conspiracy and Intent to Defraud*

Crump next argues that there was insufficient evidence to prove her "knowledge of, and agreement to be part of" "a nationwide network of telemarketing companies that used sales scripts to defraud victim-consumers, many of whom were elderly and otherwise vulnerable." Appellant's Br. 42 (citation modified). She asserts that her "interactions with codefendants outside of [RCHO] primarily consisted of buying and selling lead lists with potential customers to call—an act that is both lawful and a necessary component of *every* telemarketing job." *Id.* at 42–43. She points to her repeated denials of any knowledge of scripts used by other companies.

To establish that Crump conspired to commit mail fraud, the government had to prove that Crump knowingly joined the conspiracy to commit mail fraud. *Louper-Morris*, 672 F.3d at 555. "The elements of conspiracy may be proved by direct or circumstantial evidence, and the jury may draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented in the evidence." *Id.* (quoting *United States v. Rodriguez-Ramos*, 663 F.3d 356, 361 (8th Cir. 2011)).

Viewing the facts in the light most favorable to the verdict, we hold that the jury could reasonably conclude that Crump had the requisite knowledge and intent to join the conspiracy to commit fraud. First, Crump initially worked as an RCHO telemarketer who made sales calls before becoming its general manager. In that capacity, she "ran the office," R. Doc. 2034, at 212, which included "oversee[ing] the sales room" and RCHO's customer relations management system, *id.* at 213. She served as the "right hand" of Williams, R. Doc. 2031, at 39, who utilized the "price reduction" sales pitch, R. Doc. 2034, at 212, which was a "lie," R. Doc. 2029, at 48. As discussed *supra*, RCHO's script was designed to "misle[a]d its customers into believing they were receiving a discount on their current magazines but then billed

---

commodities fraud statutes. The fraud statutes have long been held to encompass implied representations and misleading omissions." (citation modified)).

them for a whole new subscription." Appellee's Br. at 48. The jury could reasonably infer that because Crump oversaw the RCHO telemarketers and was once a RCHO telemarketer, she was aware of the misleading script.

Second, Crump's knowledge of, and agreement to be part of, the fraud is "evidenced by her buying, selling, and exchanging leads with other fraudulent magazine companies and brokers" from around the country. Appellee's Br. 55. The evidence showed that Crump handled leads for RCHO and engaged with lead list brokers to obtain "lists of vulnerable individuals with existing magazine subscriptions." R. Doc. 2307, at 2. For example, Crump inquired of Klibanoff whether he had "something good" because RCHO wanted to "buy a good file," which Klibanoff testified meant that Crump was asking for "PDS names that [RCHO] c[ould] use to commit their premeditated fraud." R. Doc. 2031, at 47. She also inquired whether Klibanoff had "some fire" lead lists. Gov't Ex. F133. According to trial testimony, "'[f]ire' is a description that some of the[] [conspirators] use[d] for the best leads. They're fire. They're hot. They're great." R. Doc. 2032, at 265. These leads were the fraudulent PDS leads. *See id.* Similarly, Crump exchanged messages with Harbert, who sent her lead lists and encouraged her to "[u]se your renewal pitch on them." Gov't Ex. F71. The renewal pitch "offer[ed] [customers] a renewal[,] which turne[d] out to be a second order or new order." R. Doc. 2032, at 266.

Crump also coordinated the sharing of the fraudulent PDS lead lists between RCHO and Michelizzi's and Dahl's companies. When Crump exchanged the lead lists with these companies, she "knew that [they] were both calling the same people." R. Doc. 2034, at 216–17. For example, Crump shared a file titled "more good stuff7-11-11.xls" with Dahl, in which she advised him that the file was "really good, so your crew should do well on these." Gov't Ex. F1.

Third, the jury could infer Crump's knowledge of the conspiracy based on her awareness of numerous consumer complaints that RCHO received alleging fraud, credit card chargebacks, and state investigations into RCHO's fraudulent practices.

*Cf. United States v. Godfrey*, 787 F.3d 72, 77 (1st Cir. 2015) (holding, in mail fraud and wire fraud prosecution of owners of company purporting to sell mortgage modifications, government's introduction of 32 emails from complaining customers and six cease-and-desist letters sent by state entities addressed to the company were admissible for the limited purpose of showing that the defendants "had notice" of customers complaining about fraudulent activities to counter defense that defendants did not know of their employees' fraudulent sales tactics). The record contains multiple examples of consumer complaints alleging RCHO's deception of customers into purchasing new subscriptions. *See, e.g.*, R. Doc. 2039, at 171 (complaint); R. Doc. 2034, at 220 (detailing "complaint sharing system"). Additionally, "documents related to charge-back rebuttals" located "in Ms. Crump's desk" evidenced Crump's knowledge of customers' disputes over charges that RCHO had made to their credit or debit cards. R. Doc. 2038, at 197.

And the jury could also infer Crump's knowledge and intent of the conspiracy from her awareness of and reaction to Wisconsin's and Minnesota's investigations into RCHO's fraudulent practices. Crump admittedly read "some of" Wisconsin's complaint in which it alleged that "RCHO used a deceptive and misleading sales script," R. Doc. 2040, at 263, which "led Wisconsin residents to believe that a magazine company they currently had an agreement with was the entity who was calling them concerning their magazine subscriptions," *id.* at 94. Crump was also aware of the consent judgment that RCHO entered with Wisconsin and signed that judgment in her capacity "as a notary." *Id.* at 262. Furthermore, Crump's reaction to Minnesota's investigation of RCHO showed her knowledge of RCHO's fraud. Testimony showed that Crump was "scared [and] concerned about the investigation." R. Doc. 2034, at 192. She discussed removing "bad scripts out of the office," *id.* at 192–93, and "creating a script to send to the [Minnesota] Attorney General's Office that would appear to be compliant," *id.* at 218.

Crump counters that she did "what she could to manage [RCHO] in good faith" by retaining CompliancePoint "to conduct a site visit and provide suggestions for how [RCHO] could best comply with telemarketing laws." Appellant's Br. 10–

11. But the evidence showed that RCHO hired CompliancePoint only "to create the appearance of legitimacy." R. Doc. 2029, at 165. And there is sufficient evidence that Crump knew of the ruse. At no time did Crump ever disclose to CompliancePoint that RCHO "telemarketers [were] calling new customers without disclosing that they were, in fact, a new magazine company," that RCHO telemarketers were calling "customers with existing magazine subscriptions with a different company, and representing themselves as calling from the customer's current magazine provider," or that RCHO was "billing customers for new magazine subscriptions without getting those customers' explicit approval to do so." R. Doc. 2040, at 79. Nor did Crump discuss with CompliancePoint any of the customer complaints that RCHO had received, including complaints from the BBB or state attorneys general.

### 3. *Summary*

In summary, we hold that there was sufficient evidence for the jury to find Crump guilty of wire fraud and conspiracy to commit mail fraud.

## B. *Jury Instructions*

Crump next argues that the district court abused its discretion in instructing the jury on the materiality element of wire fraud.

> Ordinarily, we review a district court's formulation of jury instructions for an abuse of discretion and its interpretation of law *de novo*. The test is whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury. Generally, a defendant is entitled to a specific jury instruction that conveys the substance of his request if his request is timely, is supported by the evidence in the case, and is a correct statement of the law.

*United States v. Wilson*, 142 F.4th 1045, 1049 (8th Cir. 2025) (citation modified), *cert. denied*, No. 25-6219, 2026 WL 79916 (U.S. Jan. 12, 2026).

Here, the district court instructed the jury that "[a] fact, falsehood, representation, or promise is 'material' if it has a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction." R. Doc. 2167, at 66, 71. The district court's instruction was consistent with current Eighth Circuit precedent. *See United States v. Kidd*, 963 F.3d 742, 747 (8th Cir. 2020) ("The district court properly instructed the jury that information is *material* if it has a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction." (emphasis added) (citation modified)).

Nonetheless, Crump contends that the district court erred in denying her alternative essence-of-the-bargain materiality instruction for wire fraud.[7] She maintains that her request was supported by the evidence and was necessary in light of "the significant differences between the magazine companies' pitches." Appellant's Br. 45. She asserts that the government has recognized and conceded in other fraud cases involving inducement to contract that such instruction is necessary.

Consistent with this court's definition of "material" in *Kidd*, the Court in *Kousisis* defined a material misrepresentation as one that "a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." 605 U.S. at 131. The district court's materiality instruction was in accordance with *Kidd*'s and *Kousisis*'s definition of material misrepresentation; as a result, the district court did not abuse its discretion in denying Crump's requested instruction.[8]

---

[7]In her opening brief, Crump also argued that the district court abused its discretion by declining to give her proposed instruction that fraud must deprive the victim of a traditional property interest. Appellant's Br. 46–47. Post-*Kousisis*, Crump no longer challenges the district court's refusal. Appellant's Reply Br. 14.

[8]In *Kousisis*, "the parties debate[d] the details of the materiality standard for purposes of § 1343," with "[t]he [g]overnment . . . propos[ing] an essence-of-the-bargain test, under which a misrepresentation is material only if it goes to the very

## C. *Discovery Violations*

Lastly, Crump argues that the district court erred in denying her motions for dismissal or a new trial for alleged violations of Rule 16 and *Brady*.

"A district court has broad discretion with respect to discovery motions, and we will uphold the decision of the district court unless, considering all the circumstances, its rulings are seen to be a gross abuse of discretion resulting in fundamental unfairness at trial." *United States v. Maloney*, 102 F.4th 904, 915–16 (8th Cir. 2024) (citation modified). We review for an abuse of discretion "a district court's decision not to exclude evidence"; we review for clear error its "[s]ubsidiary factual findings." *Id.* at 916 (citation modified). "We review allegations of *Brady* violations *de novo* and denials of motions for a new trial based on a *Brady* violation for an abuse of discretion." *United States v. Holmes*, 137 F.4th 734, 741 (8th Cir. 2025) (citation modified).

"Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing . . . any relevant written or recorded statement by the defendant" that is "within the government's possession, custody, or control; and []the attorney for the government knows—or through due diligence could know—that the statement exists." Fed. R. Crim. P. 16(a)(1)(B)(i). Additionally, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy," among other things, "documents, data, . . . [and] tangible objects . . . within the government's possession, custody, or control" that satisfy the following criteria: "(i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E)(i)–(iii). A party's failure to comply with Rule 16 may result in the

essence of the parties' bargain." 605 U.S. at 131 (citation modified). But the Court declined to "settle the debate" because the petitioners did "not contest[] that their misrepresentations were material." *Id.* at 132. Instead, the Court "reiterate[d] that materiality of falsehood is an element of—and thus a limit on—the federal fraud statutes." *Id.* (citation modified).

district court "(A) order[ing] [a] party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(A)–(D).

Additionally, due process requires the prosecution to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "To establish a *Brady* violation, a defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *United States v. Szczerba*, 897 F.3d 929, 941 (8th Cir. 2018) (citation modified).

### 1. *Emails*

Crump argues that the government had "constitutional [and] discovery obligations with respect to [her] emails." Appellant's Br. 49–50. According to Crump, the government possessed her emails in February 2020 when it "executed the search warrant, turned on [her ]computer, and opened up the webpage containing her logged in company Gmail account." *Id.* at 50. She maintains that her emails "remained in the [g]overnment's possession with the seized computer." *Id.* Alternatively, she contends that the government exercised control over her emails because "[t]he search warrant coupled with the digital devices provided the [g]overnment with the 'legal right' to access the emails." *Id.* Finally, she argues that the government was obligated to preserve her emails because it "knew that Crump used her email to conduct business" and "knew (or should have known) that the emails would contain exculpatory communications," such as "Crump's emails with CompliancePoint and emails with asserted coconspirators." *Id.* at 51. She argues that the government's failure to disclose and preserve these emails resulted in the jury receiving a skewed portrayal of her role in the conspiracy.

Having reviewed the record, we hold that no Rule 16 or *Brady* violation occurred with respect to Crump's emails. Under *Brady*, Crump first had to show that the government suppressed the emails. *See Szczerba*, 897 F.3d at 941. Crump "falls at th[is] first hurdle." *United States v. Adkins*, 161 F.4th 1130, 1134 (8th Cir. 2025).

"While *Brady* requires the [g]overnment to tender to the defense all exculpatory evidence in its possession, it establishes no obligation on the Government to seek out such evidence." *United States v. Riley*, 657 F.2d 1377, 1386 (8th Cir. 1981) (quoting *United States v. Walker*, 559 F.2d 365, 373 (5th Cir. 1977)); *see also United States v. Hall*, 171 F.3d 1133, 1145 (8th Cir. 1999) ("[T]he government has no obligation to obtain for a defendant records that it does not already have in its possession or control."). "*Brady* requires the prosecution to disclose to the defendant only evidence in the prosecution's possession." *United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994). Similarly, Rule 16 requires the government to disclose evidence "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(B)(i), (E).

"When information is readily available to the defendant, it is not *Brady* material, and the prosecution does not violate *Brady* by not discovering and disclosing the information." *Jones*, 34 F.3d at 600. And "the government need not disclose evidence available to the defense from other sources or evidence already possessed by the defendants." *United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996). Nor is there a "*Brady* violation if the defendant[], using reasonable diligence, could have obtained the information [himself]." *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998) (citation modified). Thus, "the government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels." *Adkins*, 161 F.4th at 1134 (citation modified).

Here, Crump's emails were not in the government's possession or control. *See Jones*, 34 F.3d at 599. When law enforcement executed the search warrant, "Crump had a number of her email accounts open on her computer," including "her [e]mail

-26-

for her RCHO account." R. Doc. 1963-5, at 2.[9] But agents did not search or access her web-based email accounts because the warrant did not authorize the seizure of data from the internet. Instead, agents were only permitted to access emails saved locally to the devices. R. Doc. 1814, at 2, 123. As the district court recognized, accessing emails on remote servers required a separate search warrant. R. Doc. 1970, at 6 n.2. The government, however, never obtained a separate search warrant for Crump's RCHO email account. Thus, it never possessed or controlled her emails. Nor was the government obligated to secure a separate warrant to obtain Crump's emails stored on Google's remote servers. *See Riley*, 657 F.2d at 1386; *Hall*, 171 F.3d at 1145. Finally, Crump could have obtained her web-based emails using reasonable diligence. *See Jones*, 160 F.3d at 479; *Adkins*, 161 F.4th at 1134. As the district court noted, "[t]hough now unavailable, Crump had two years to log in to her email account and download content, or, if that was not an option, to subpoena the content from Google." R. Doc. 1970, at 7.

Crump has also failed to show that the emails were favorable to her, *see Szczerba*, 897 F.3d at 941, and that they were material, *see id.*; Fed. R. Crim. P. 16(a)(E)(i). "Mere speculation that materials may contain exculpatory evidence is not sufficient to sustain a *Brady* claim." *United States v. Brown*, 360 F.3d 828, 833 (8th Cir. 2004) (citation modified). As the district court observed, "Crump has . . . provided scant evidence beyond allegations that the emails contained exculpatory content." R. Doc. 1970, at 7. Likewise, she has merely speculated that the emails would be material; that is, result in a "reasonable probability" of her acquittal. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (citation modified)).

---

[9]The government photographed the computer screen. *See* R. Doc. 1963-5, at 2. As the district court noted, "Crump does not allege that law enforcement read her emails, but only that the emails were open on her computer screen. Nothing about that email window appears facially exculpatory." R. Doc. 1970, at 6.

## 2. *Digital Evidence Seized from RCHO and Williams*

The district court found that the government inadvertently suppressed digital evidence seized from RCHO and Williams and that favorable materials existed in the RCHO devices. But it concluded that the digital evidence was not material under Rule 16 and *Brady*. Crump challenges the district court's conclusion on materiality. She asserts that the undisclosed digital evidence "support[ed] key issues for [her] defense, including that [she] acted with good faith and without intent to defraud and that [RCHO] did not have the hallmarks of fraud present at other companies." Appellant's Br. 53–54. This evidence included "Crump's scrubbing of leads to comply with age and other restrictions, meticulous record keeping, and policies relating to treating customers fairly." *Id.* at 53.

We reject Williams's argument that the digital evidence was material. *See Kyles*, 514 U.S. at 434. The "touchstone of materiality is a reasonable probability of a different result." *Id.* (citation modified). A defendant shows "[a] reasonable probability of a different result . . . when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (citation modified). The defendant must "show[] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. "In other words, [the defendant] . . . [is] entitled to a new trial only if [she] establish[es] the prejudice necessary to satisfy the materiality inquiry." *Turner v. United States*, 582 U.S. 313, 324 (2017) (citation modified).

Having reviewed the record, we agree with the district court that "[t]he favorable evidence from the RCHO devices pales in comparison to the evidence of Crump's guilt introduced at trial," R. Doc. 2425, at 11; therefore, Crump has failed to show a reasonable probability that she would have been acquitted had the government disclosed the evidence.[10]

---

[10]Furthermore, the government's mid-trial disclosure did not come too late for Crump to use the evidence. *See United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005); *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008). Crump's failure to accept the district court's offer of time to review the evidence before

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

presenting her defense suggests that Crump "was not prejudiced by the delayed disclosure." *United States v. Hicks*, 495 F. App'x 633, 640 (6th Cir. 2012) (unpublished).